833 So.2d 927 (2002)
STATE of Louisiana
v.
Alairis PAYNE.
No. 2001-KK-3196.
Supreme Court of Louisiana.
December 4, 2002.
Rehearing Denied January 24, 2003.
*930 Richard P. Ieyoub, Attorney General, James M. Bullers, District Attorney, Michael A. Pitman, Bossier City, Counsel for Applicant.
John M. Lawrence, Shreveport, George W. Thornell, Counsel for Respondent.
KNOLL, Justice.
In the pre-trial stages of this first-degree murder case, we must determine whether the rigid prophylactic rule announced in Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), concerning defendant's right to counsel during custodial interrogation, was clearly and unambiguously invoked by defendant, Alairis Payne. The lower courts suppressed defendant's statements, confession and a videotape of the crime scene, on the grounds of the Edwards prophylactic rule. For the following reasons we reverse, finding that defendant was neither in custodial interrogation nor was custodial interrogation imminent; and further, her comments, "may I call a lawyercan I call a lawyer?" were not clear and unambiguous under the circumstances so as to put a reasonable police officer on notice that defendant was invoking her Miranda[1] right to counsel during custodial interrogation.

FACTS AND PROCEDURAL HISTORY
On February 23, 2000, doctors at Schumpert Medical Center summoned the Bossier City Police Department to investigate possible child abuse. The two-year-old child, Sahara Onishea, had been brought to the emergency room by his foster father, Andrew Payne, in an unconscious condition. Dr. Gordon Webb, the attending emergency room physician, noted "severe head injury compatible with *931 blunt trauma. Multiple bruises and abrasions of varying ages suggestive of repeated trauma. Bruises of multiple time interval and over many parts of the body suggestive of physical abuse."[2] The child was transferred to the Pediatric Intensive Care Unit and underwent surgery to remove a blood clot from the brain. The child was placed on life support, but died four days later on February 27, 2000, as a result of his injuries.
On February 23, 2000, after taking the initial child abuse report at the hospital, the police went to the home of Andrew and Alairis Payne. The Paynes were foster parents not only to the injured child, Sahara Onishea, but also to a six-week-old infant, W.D.[3] Upon arriving at the Payne residence, Detective Joseph Thomerson informed Alairis Payne that the police department was investigating the injury to Sahara and they needed to speak with her at the police station. The police entered her residence and presented her with a consent to search form, which she signed. Defendant was also advised of her Miranda rights by Detective Thomerson and signed a written rights form. Later, Detective Thomerson transported defendant to the Bossier City Police Department. It is undisputed that he did not attempt to interview or interrogate defendant; she was neither handcuffed nor placed under arrest. When defendant arrived at the police department, she waited in the break room approximately fifteen to thirty minutes until she was interviewed by Detective Jimmy Stewart.
Defendant was again informed of her Miranda rights, and gave the first of two tape-recorded statements. In the first statement defendant did not admit to intentionally harming the child. Detective Stewart then met a second time with the defendant and he again advised her of her Miranda rights. He told her of the surgery to remove the blood clot from Sahara's brain. In this second taped statement, defendant confessed to injuring Sahara. She stated that she had had a migraine, and while bathing the child, she and the child had struggled. Defendant claimed the child pulled her into the bathtub during the struggle whereupon she grabbed the child by the right side of his head and banged the left side of his head against the bath wall approximately three times. She also confessed to abusing the child in the past.
Detective Stewart received consent from defendant to conduct a videotaped walk-through of the residence in which she explained how she had battered the child. Prior to conducting this videotaped walk-through, defendant signed another consent to search form.
After defendant was arrested and indicted for first-degree murder, she filed a motion to suppress statements alleging Detective Stewart coerced a statement from her by use of intimidation. Defendant later filed a supplemental and amended motion to suppress statements alleging she tried to call her attorney before going to the police station on February 23, 2000, by using a cordless phone which one of the police officers took away from her. Defendant claims the subsequent interrogation was conducted in violation of her invocation of her right to have an attorney present during questioning.
The trial court conducted a two-day hearing on the motion to suppress. At the *932 hearing the crucial issue was whether defendant actually made a request for an attorney, and if so, whether Detective Thomerson heard her. The record of this hearing shows conflicting testimony among the witnesses.
Defendant testified her close friend, Jessica Davis, arrived at the house at almost the same time as the police and that she and Ms. Davis were led to a patrol car. Defendant stated she and Ms. Davis were trying to figure out what was going on because no one was answering defendant's questions. Defendant testified she had a cordless phone in her hand that she brought outside with her. She stated Detective Thomerson took the phone from her and placed it on the roof of his police car. Detective Thomerson turned to speak with someone and defendant turned to Ms. Davis and asked if she should call John, her father-in-law who is an attorney in Detroit, Michigan. Ms. Davis told defendant she should call him, so she picked up the phone from the roof of the police car. Defendant claims Detective Thomerson took the phone away from her again and asked Ms. Davis to please step over to the other squad car. Defendant stated she tried to call again; at this point Detective Thomerson took the phone from her and locked her in the police car.
Ms. Davis testified defendant had a phone in her hand which Detective Thomerson took from defendant and placed on the top of the police car. Ms. Davis claimed when defendant emerged from the house, the police had Ms. Davis sit in the front passenger seat of the patrol car in the driveway and had defendant sit in the rear driver's side of another patrol car parked on the road in front of the house; the doors to the patrol cars were opened at that point. Ms. Davis was not allowed to talk to defendant. Ms. Davis stated defendant said "may I call a lawyercan I call a lawyer?" and reached up for the phone. Detective Thomerson pushed the phone farther away on top of the car and said "you don't need this."
Detective Thomerson testified that he did not hear defendant ask if she should call a lawyer. He stated the last time he saw the cordless phone was when defendant was inside her residence.
In its oral reasons for ruling, the trial court noted the conflicting testimony. The trial court noted Detective Thomerson testified defendant never asked for an attorney. As to defendant, the trial court found she was not credible because she had falsely claimed to have been denied the use of the bathroom and had urinated upon herself, she falsely claimed to have been denied medication for her migraines and she falsely claimed to have been rendered incoherent by medication she had taken. Because her credibility was doubtful, the trial court disregarded defendant's testimony. The trial court was persuaded by the testimony of Ms. Davis, primarily because her testimony was neither refuted nor rebutted by the State. In accepting Ms. Davis's testimony, the trial court stated:
[W]e have the testimony of a witness, Mrs. Jess Davis, who said that Ms. Payne asked for a lawyer. That testimony has not been refuted nor has it been rebutted. Mr. Thomerson said that she [defendant] never asked for an attorney.
The trial court rejected the testimony of Detective Thomerson and accepted the testimony of Ms. Davis that the defendant had said "may I call a lawyercan I call a lawyer?" while reaching for the cordless phone. The trial court granted defendant's motion to suppress and suppressed all statements defendant made, including her confession and a videotape of the crime scene. In granting the motion, the *933 trial court reasoned Minnick v. Mississippi[4] makes it clear that once a defendant asks for an attorney, all interrogation must cease and the police cannot initiate questioning, unless the defendant voluntarily reinstates the conversation.
The State appealed the ruling of the trial court. The court of appeal converted the appeal to a writ application and denied the writ in a two to one decision, finding the issue turned on a credibility determination and the trial court was in the best position to make that determination. The State filed an application for rehearing, which was not considered in a two to one decision. We granted certiorari on this troubling issue to further examine the legal requirements of the Edwards prophylactic rule. State v. Payne, 01-3196 (3/22/02), 811 So.2d 924.
In urging the trial court erred in granting the motion to suppress, the State contends: (1) that the trial court should not have accepted the testimony of Ms. Davis over the testimonies of defendant and the police officers; and (2) even if we accept the testimony of Ms. Davis, defendant's statement "may I call a lawyercan I call a lawyer" is equivocal and ambiguous and therefore not a clear invocation for counsel.
The defendant contends the trial court did not err in granting the motion to suppress, because its ruling was based on a credibility determination and further, the defendant made a clear and unambiguous invocation of her right to counsel.
We did not grant this writ to further examine the credibility determinations of the trial court in accepting Ms. Davis's testimony over the testimonies of defendant and police officers. We recognize that credibility determinations by the trier of fact are given great weight by reviewing courts and we will not set a credibility determination aside unless it is clearly contrary to the record evidence. See State v. Brooks, 92-3331, p. 11 (La.1/17/95), 648 So.2d 366, 372. Our review of the record shows adequate evidence to support the trial judge, who observed the conduct and demeanor of the witnesses, and found defendant did say "may I call a lawyercan I call a lawyer?" to Detective Thomerson.
While we accept this credibility determination, however, the legal findings of the trial court are subject to review without the great deference standard we attach to credibility determinations. Notwithstanding defendant said "may I call a lawyercan I call a lawyer?", the lower courts should have analyzed this statement before granting the motion to suppress in the context of whether it was a proper invocation of defendant's right to counsel, i.e., was this statement clear and unambiguous under the circumstances so as to put a reasonable police officer on notice that defendant was invoking her Miranda rights to counsel during custodial interrogation. See Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).
We recognize that this is a troubling and difficult issue as can be seen from our federal and state jurisprudence. There are ad infinitum ways one can invoke one's right to counsel and there are different "shades" of whether one invoked this right. While we find this issue is difficult and troubling, we are guided by our federal and state jurisprudence that have developed standards that aid us in determining whether a defendant sufficiently invoked his right to counsel.

*934 DISCUSSION
In Miranda v. Arizona, the United States Supreme Court held that a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins. Miranda, 384 U.S. at 469-473, 86 S.Ct. at 1625-1627. "The right to counsel established in Miranda was one of a `series of recommended `procedural safeguards'... [that] were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected.'" Davis v. United States, 512 U.S. at 457, 114 S.Ct. at 2354. The Fifth Amendment right identified in Miranda is the right to have counsel present at any custodial interrogation. Edwards v. Arizona, 451 U.S. at 485-486, 101 S.Ct. at 1885. Of importance to the present case, the Supreme Court in Miranda explained what is meant by custodial interrogation: "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Rhode Island v. Innis, 446 U.S. at 298, 100 S.Ct. at 1688 (citing Miranda v. Arizona, 384 U.S. at 444, 86 S.Ct. at 1612)(emphasis added). The concern of the Court in Miranda was that the "interrogation environment" created by the interplay of interrogation and custody would "subjugate the individual to the will of his examiner" and thereby undermine the privilege against compulsory self-incrimination. Innis, 446 U.S. at 299, 100 S.Ct. at 1688 (citing Miranda 384 U.S. at 457-458, 86 S.Ct. at 1619). The special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. Innis, 446 U.S. at 300, 100 S.Ct. at 1689. "Interrogation," as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself. Id.
The purpose of the Miranda-Edwards guarantee of right to counsel is to protect the interest of the suspect's desire to deal with the police only through counsel. State v. Kelly, 95-1663, p. 6 (La.App. 3 Cir. 5/8/96), 677 So.2d 495, 499 (citing McNeil v. Wisconsin, 501 U.S. 171, 178, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991)). It is the inherent coercive effect of custody and interrogation on an accused that is the essential predicate to the prescription contained in the Miranda-Edwards line of cases, that counsel be present if requested, when an interrogation occurs in a custodial setting. "The [Supreme] Court presumes that the confluence of interrogation and custody generate an intolerable degree of pressure upon a criminal suspect. Thus, the combined impact of interrogation and custody make counsel's compulsion-dispelling presence or, at least, the opportunity to claim that presenceessential." James J. Tomkovicz, Standards for Invocation and Waiver of Counsel in Confession Contexts, 71 Iowa L.Rev. 975, 991 (1986) (footnotes omitted); see also Miranda, 384 U.S. at 460, 86 S.Ct. at 1620. Because the presence of both a custodial setting and official interrogation is required to trigger the Miranda right-to-counsel prophylactic, absent one or the other, Miranda is not implicated. See Miranda, 384 U.S. at 477-78, 86 S.Ct. at 1629-30; Illinois v. Perkins, 496 U.S. 292, 297, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990) ("It is the premise of Miranda that the danger of coercion results from the interaction of custody and official interrogation").
*935 When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. Edwards, 451 U.S. at 484, 101 S.Ct. at 1884-1885. Once an accused has expressed his desire to deal with the police only through counsel, he is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police. Edwards, 451 U.S. at 484-485, 101 S.Ct. at 1885. It is inconsistent with Miranda and its progeny for the authorities, at their insistence, to reinterrogate an accused in custody if he has clearly asserted his right to counsel. Edwards, 451 U.S. at 485, 101 S.Ct. at 1885 (emphasis added). This "second layer of prophylaxis for the Miranda right to counsel," McNeil v. Wisconsin, 501 U.S. at 176, 111 S.Ct. at 2208, is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights," Michigan v. Harvey, 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990). Davis, 512 U.S. at 458, 114 S.Ct. at 2355.
The Miranda right to counsel is a prophylactic rule that does not operate independent from the danger it seeks to protect against, i.e., the compelling atmosphere inherent in the process of in-custody interrogation, and the effect that danger can have on a suspect's privilege to avoid compelled self-incrimination. See Miranda, 384 U.S. at 478, 86 S.Ct. at 1630. The inherent compulsion that is brought about by the combination of custody and interrogation is crucial for the attachment of Miranda rights. See Miranda, 384 U.S. at 478, 86 S.Ct. at 1630 (emphasis added). The Supreme Court stated the invocation of that guarantee "... requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." McNeil, 501 U.S. at 178, 111 S.Ct. at 2209 (emphasis in original).
The applicability of the "`rigid' prophylactic rule" of Edwards requires courts to "determine whether the accused actually invoked his right to counsel." Davis v. United States, 512 U.S. at 458, 114 S.Ct. at 2355 (emphasis in original) (citations omitted). To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. Davis, 512 U.S. at 458-459, 114 S.Ct. at 2355. Invocation of the Miranda right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." Davis, 512 U.S. at 459, 114 S.Ct. at 2355 (citation omitted). If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable police officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, the cessation of questioning is not required. Id. (emphasis in original). The suspect must articulate his desire to have counsel present with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. Id. In analyzing the prophylactic rules of Miranda and Edwards, we are mindful that the "value of any prophylactic rule ... must be assessed not only on the basis of what is gained, but also on the basis of what is lost." Minnick, 498 U.S. at 161, 111 S.Ct. at 495 (Scalia, J., dissenting). "Admissions of guilt are more than merely desirable; they *936 are essential to society's compelling interest in finding, convicting, and punishing those who violate the law." Moran v. Burbine, 475 U.S. 412, 426, 106 S.Ct. 1135, 1143, 89 L.Ed.2d 410 (1986).
Recently, the United States Fifth Circuit Court of Appeals, sitting en banc, addressed this troubling issue in Soffar v. Cockrell, 300 F.3d 588, 595 (5th Cir.2002), and held the suspect's procedural questions while he was in custodial interrogation did not rise to the level of unambiguous invocation of his right to counsel. In that case, Max Soffar, a Texas state prisoner, applied for a writ of federal habeas corpus. A panel of the Fifth Circuit granted him habeas relief on the issue of his Fifth Amendment rights. The panel opinion, applying a totality of the circumstances analysis and remaining mindful of Michigan v. Jackson,[5] wherein the Supreme Court stated that the courts must give a "broad, rather than a narrow, interpretation to a request for counsel," concluded that Soffar had unambiguously requested counsel during custodial interrogation. Soffar v. Cockrell, 300 F.3d at 595, n. 6; Soffar v. Johnson, 237 F.3d 411, 455 (5th Cir.2000), overruled by Soffar v. Cockrell, 300 F.3d 588 (5th Cir. 2002). In overruling the panel decision, the Fifth Circuit examined the suspect's statements with regard to the "bright-line" rule of Davis, under which "a statement either is such an assertion of the right to counsel or it is not." Soffar v. Cockrell, 300 F.3d at 595 (quoting Davis, 512 U.S. at 459, 114 S.Ct. at 2355). The en banc court categorized Soffar's statements made during custodial interrogation as: he asked whether he should get an attorney; how he could get one; and how long it would take to have an attorney appointed. Soffar v. Cockrell, 300 F.3d at 595. The Fifth Circuit, examining its own precedent and decisions of other circuits, found each of these questions has been rejected as procedural and too equivocal to constitute a clear invocation of counsel. Id.
In State v. Abadie, 612 So.2d 1, 5 (La. 1993), we found where the suspect unsuccessfully sought legal assistance from an attorney who was a judge-elect, and told the authorities he refused to answer any more questions until he spoke to his attorney, the suspect had invoked his right to counsel with direct, clear and unequivocal requests such that all interrogation had to cease. In Abadie, before reaching the issue of the admissibility of the defendant's confession, we first had to decide whether the accused had requested the assistance of counsel. The defendant, Thomas Abadie, had been brought to the police station for questioning in the matter of a homicide. Abadie was advised of his Miranda rights and questioned about the murder. When the questioning turned to an unrelated attempted rape case, Abadie refused to answer any more questions until he spoke to his friend, a local attorney and judge-elect. The attorney spoke to Abadie and advised him that as he was a judge-elect, he could not represent Abadie or give him advice. Even before Abadie spoke to the attorney/judge-elect, the police asked Abadie to agree to further questioning under polygraph. In response, Abadie again asked to speak to a lawyer.
In Abadie we examined Miranda and its progeny as it existed then, and we found the request for a lawyer need not be formal or direct, or for a particular attorney, but is sufficiently conveyed by even an unsuccessful attempt to reach a lawyer. Abadie, 612 So.2d at 5 (citing United States v. DeLeon, 412 F.Supp. 89 (D.Vi. *937 1976), State v. Slobodian, 57 N.J. 18, 268 A.2d 849 (1970), United States v. Porter, 764 F.2d 1 (1st Cir.1985), Hendrickson v. State, 285 Ark. 462, 688 S.W.2d 295 (1985)). In Abadie, we looked to decisions of other jurisdictions to aid us in determining whether the accused had requested counsel. After a thorough analysis of United States Supreme Court opinions and a scholarly treatise, we found that Abadie had made "direct, clear and unequivocal requests for counsel" of two police officers. Abadie, 612 So.2d at 5. It was after our decision in Abadie that the United States Supreme Court addressed the issue of how to determine whether the accused actually invoked his right to counsel. Davis, 512 U.S. at 458, 114 S.Ct. at 2355.
In Davis, the Supreme Court declared that the suspect must "unambiguously request" counsel "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney" in order to cease custodial interrogation. Davis, 512 U.S. at 459, 114 S.Ct. at 2355. The United States Supreme Court specifically declined to extend Edwards and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney. Id. In declining to extend Edwards the Court stated:
The rationale underlying Edwards is that the police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation. But when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning "would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity," Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975), because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present. Nothing in Edwards requires the provision of counsel to a suspect who consents to answer questions without the assistance of a lawyer.... We also noted [in Miranda, 384 U.S. at 485, 86 S.Ct. at 1633] that if a suspect is "indecisive in his request for counsel," the officers need not always cease questioning. Davis, 512 U.S. at 460, 114 S.Ct. at 2355-2356.
The Court held that after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney. Id., 512 U.S. at 461, 114 S.Ct. at 2356. Davis established a bright-line rule, under which "a statement either is such an assertion of the right to counsel or it is not." Soffar v. Cockrell, 300 F.3d at 595 (citing Davis, 512 U.S. at 459, 114 S.Ct. at 2355).
Our finding in Abadie that requires a suspect to make a "direct, clear and unequivocal requests for counsel" has not been abrogated by the Davis decision, but rather is reinforced by the Davis decision. Both Abadie and Davis require that a suspect make a clear and unequivocal request to invoke the Miranda right to counsel.
In the present case, deciding whether defendant's questions to Detective Thomerson constitute an unambiguous request for counsel articulated clearly such that a reasonable police officer under the circumstances would understand the questions to be a request for an attorney, we remain mindful that "[i]n considering how a suspect must invoke the right to counsel, we must consider the other side of the Miranda equation: the need for effective *938 law enforcement." Davis, 512 U.S. at 461, 114 S.Ct. at 2356.
In Abadie, we concluded that as the suspect's request was "direct, clear and unequivocal," the suspect had invoked his right to counsel such that custodial interrogation must cease. Abadie, 612 So.2d at 5. The suspect must articulate his or her desire to have counsel present with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. Davis, 512 U.S. at 459, 114 S.Ct. at 2355 (emphasis added). In the present case we find that unspecific questions to a police officer at the crime scene, in the initial stages of an investigation, with more than one suspect present, where interrogation is neither occurring nor imminent, cannot be construed as a clear and unambiguous request for the presence of counsel at interrogation. The term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. Abadie, 612 So.2d at 6 (citing Innis, 446 U.S. at 301, 100 S.Ct. at 1689-90).
Our decision in Abadie calls for a reviewing court to apply an "objective test" that prohibits all police speech or conduct that creates a situation in which the suspect probably will experience the functional equivalent of direct questioning by concluding that the police are trying to get him to make an incriminating response. Id. Under this objective test, in the present case, the conduct of the police at the initial visit to the defendant's home, and while the defendant was inside of the police car, should not have led the defendant to conclude that the police sought an inculpatory statement. Considering the conduct of the police, we find it did not create a situation in which the suspect experienced the functional equivalent of direct questioning that would implicate Innis and Abadie.
While Detective Thomerson took the phone from defendant and ultimately locked her in the police car, defendant was not being interrogated. Significantly we note this occurred at the crime scene in the very early stages of the investigation well before custodial interrogation began. Her questions "may I call a lawyercan I call a lawyer?" were not in response to any questions by Detective Thomerson, who was standing outside of the police car. It is undisputed that Detective Thomerson did not question defendant at the crime scene, or while he transported her to the police department, or at any time. Nor was there any police speech or conduct that was the functional equivalent of interrogation during the period of the initial investigation. Defendant waited at the police department some fifteen to thirty minutes before being questioned by Detective Stewart; before he questioned her, Detective Stewart informed defendant of her Miranda rights and ascertained that her waiver of those rights was knowing and voluntary. Under these circumstances we find defendant's questions to Detective Thomerson were too ambiguous and equivocal to be considered a sufficient invocation of her right to counsel. To find otherwise "would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity." Michigan v. Mosley, supra.
We further find it significant that at the time defendant made the statements, which she now claims were an invocation of counsel pursuant to the Fifth Amendment, that she was not subjected to interrogation. Thus the "inherent compulsion" *939 brought about by the combination of custody and interrogation was not present. We classify the questions asked by defendant as ambiguous under these circumstances which showed that she was not being questioned. Where there is no interplay of custody and interrogation, an individual's privilege against self-incrimination is not threatened.
In accordance with the rule announced in Davis v. United States, supra, as a matter of law, we find the defendant's statements were insufficient to invoke her right to counsel. The suspect must articulate her desire for counsel clearly and unambiguously such that a reasonable police officer, under the circumstances, would understand the statement to be a request for counsel.

DECREE
For the foregoing reasons we reverse the rulings of the lower courts. Defendant's motion to suppress is hereby denied. This case is remanded to the district court for further proceedings consistent with the views expressed herein.
REVERSED AND REMANDED.
WEIMER, J., concurs in the result and assigns reasons.
KIMBALL, J., dissents and assigns reasons.
KIMBALL, Justice, dissenting
I dissent from the majority's determination that defendant's question, "may I call a lawyercan I call a lawyer," made while she was reaching for a cordless phone, was not clear and unambiguous so as to put a reasonable police officer on notice that defendant was invoking her Miranda right to counsel. Moreover, I disagree with the majority's finding that interrogation of defendant was not imminent when she asked whether she could call a lawyer.
In my view, the totality of the circumstances presented in the instant case indicate defendant clearly and unequivocally expressed her desire to be assisted by an attorney during a time period in which she was in custody and interrogation was imminent. Courts are required to give a broad, rather than a narrow, interpretation to a suspect's request for counsel. State v. Abadie, 612 So.2d 1 (La.1993). Under a broad interpretation of the situation presented in this case, defendant's freedom was restrained, and she obviously believed she could not get out of the police car to freely obtain the telephone, which the officer had forcibly removed from her hand and placed out of her grasp on the top of the police car. Defendant's statement, "may I call a lawyercan I call a lawyer," as she reached for the phone, should have indicated to a reasonable police officer at the scene that defendant was requesting an attorney. Although phrased as a question, the words "may I call a lawyercan I call a lawyer," combined with defendant's actions in attempting to reach the telephone, are sufficient to indicate defendant's desire to be assisted by an attorney in her dealings with the police.
Additionally, custodial interrogation of defendant was imminent at the time she made the request for counsel. The officers went to defendant's home for the express purpose of questioning her about S.O.'s injuries, removed her from her home in her night clothes, separated her from her friend, told her to sit in a squad car in her driveway, and read her Miranda rights. Defendant was taken to the police station in the squad car and questioned shortly after arriving at the station. At the point she requested counsel, that defendant would be interrogated was a foregone conclusion. Interestingly, in another case decided today, the majority finds it significant for purposes of probable cause *940 that a warrant application contained the fact that two suspects were Mirandized prior to making a statement about an incident that occurred at their residence. In that case, the majority notes that the mere mention of the issuance of the suspects' Miranda rights in the affidavit would have conveyed to the magistrate that these suspects had "at least been detained in connection with an investigation of an offense...." State v. Green, 02-1022, p. 10, n. 10 (La.12/4/02), 831 So.2d 962, 970 n. 10.
Based on credible testimony recounting the events surrounding defendant's request for counsel, the trial court found that defendant properly asked for an attorney, that her request was not honored, and that her subsequent statements should therefore be suppressed. Such determination should not be disturbed unless it is not supported by the evidence. State v. Harper, 430 So.2d 627, 633 (La.1983). For the reasons expressed herein, I believe the trial court's determination was supported by the evidence. I would therefore affirm the trial court's judgment granting defendant's motion to suppress.
WEIMER, J., concurring.
This matter is an anomaly in that the trial court specifically rejected the defendant's testimony as being untruthful yet suppressed the defendant's statements based on the testimony of the defendant's friend, Jessica Davis. Defendant claims police took her cordless phone away from her as she attempted to call an attorney prior to being taken to the police station during the initial investigation of child abuse. When asked if the officer took the cordless phone away from defendant, Davis testified:
Yes, they reached down and took the phone out of her hand and put it on top of the car. She said, may I call a lawyercan I call a lawyer, reached up and grabbedwent to grab the phone, and the detective/police officer pushed the phone farther away on top of the car and said, you don't need this.
When asked specifically if she heard defendant ask to call a lawyer, Davis replied, "Yes." However, defendant testified:
I was getting ready to make a phone call to my father-in-law, who is an attorney. Detective Thomerson came out and took the phone from me and he put it on the roof of the car. He turned around to speak to somebody. I turned and talked to Jessica. I asked her should I call John .... She said yes, so I picked up the phone again. This is when Detective Thomerson came, he took it from me a second time.
Thus, defendant did not testify that she asked to call an attorney; rather, she referred to a call to "John."[1] Additionally, she admits the officer turned to speak to someone else when she turned to talk to Davis. A fair reading of this testimony is that these statements, including the critical "may I call a lawyercan I call a lawyer," involved a discussion between the defendant and her friend Davis. Based on evaluation of the testimony of defendant and Davis, it is not altogether clear the police officer, who the defendant said turned to speak to someone else, even heard the critical statement. The police officers denied the defendant requested an attorney. The trial court never specifically stated the police officer heard defendant's question, although inferentially that is the finding of the trial court.
Even if one accepts that defendant addressed the police, the fair import of her *941 words is that she posed a query, "may I call a lawyercan I call a lawyer."
The United States Supreme Court, in Davis v. United States, 512 U.S. 452, 458-459, 114 S.Ct. 2350, 2353-57, 129 L.Ed.2d 362 (1994), has stated that "if a reference [to an attorney] is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, Edwards [v. Arizona, 101 S.Ct. 1880] does not require that officers stop questioning the suspect.... Unless the suspect actually requests an attorney, questioning may continue." (Emphasis supplied.) An individual's assertion of her right to counsel under Miranda must be both clear and unambiguous before police must cease all further interrogation. Id.
The defendant was not questioned by the officers at her residence. Upon arrival at the police station she was given Miranda warnings on four occasions and she made no reference to an attorney. Additionally, the following colloquy occurred between the defendant and a detective at the police station.
Q. Before we talked I advised you of your rights, is that correct?
A. Yes.
Q.... You have a right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. You have this same right to the advice and presence of a lawyer even if you cannot afford one.... If you decided to answer questions now without a lawyer present, you will still have the right to stop answering at any time.
The defendant indicated she understood these rights. She never referenced a desire to call an attorney.
These same warnings were repeated subsequently without defendant ever referencing a desire to call an attorney. Her responses during the colloquy give meaning and content to her statement to Davis at defendant's residence which consisted of a random, unconnected comment on the subject of counsel and not a specific question relating to assistance of counsel. See Soffar v. Cockrell, 300 F.3d 588, 606 (5th Cir.2002) and cases cited therein.
The record is abundantly clear that defendant was fully advised of her Miranda rights; that she fully understood her rights; and that she knowingly and intentionally waived those rights. The advice of rights quoted above went beyond the requirements of Miranda; the detective was meticulous in pointing out to her the specifics of her right to counsel. Defendant indicated she understood her rights by her responses which were recorded and through her signing of the rights form. Defendant never requested counsel or even intimated to the detective during the recorded interviews that she wanted to seek the advice of counsel.
As indicated, the defendant posed a query, "may I call a lawyercan I call a lawyer." The detective responded to this query in the affirmative. The defendant was advised that she could confer with an attorney at any time before or during interrogation and she had the right to stop answering questions at any time. The defendant never made further reference to an attorney after she left her residence. As such, the police were justified in questioning the defendant, and her statement should not be suppressed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] These quotes are provided for background purpose only; they appear in Appellant's application for writ of certiorari filed with this court.
[3] This opinion will refer to this infant child by his initials to protect his identity. La. Sup.Ct. Rule XXXII, § 3.
[4] Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990).
[5] Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986).
[1] She testified John is her father-in-law, who is an attorney.